Submitted on remand May 18, 2022, affirmed June 14, petition for review allowed October 19, 2023 (371 Or 509)
See later issue Oregon Reports

## STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

## KEVIN LAVIN TAYLOR,
aka Kevin Lavan Taylor,
*Defendant-Appellant.*

### Multnomah County Circuit Court
17CR26979; A168298

532 P3d 502

This case, which involves a conviction for third-degree sexual abuse, is on remand from the Oregon Supreme Court in light of that court's decision in *State v. Jackson*, 368 Or 705, 498 P3d 788 (2021). *See State v. Taylor*, 369 Or 675, 508 P3d 501 (2022). *Jackson* requires the proponent of other-acts evidence to articulate a theory of relevance and explain why it does not depend on the actor's character. *Jackson*, 368 Or at 733. *Held*: The trial court did not err by admitting, under OEC 404(3), a video of the defendant moving closer to another woman in the same library, sitting in a similar cubicle, just minutes before his encounter with the victim. That other-acts evidence was relevant under a spurious plan theory: it provided a basis for inferring that defendant had a plan to sexually assault women in that library on that day. Based on the significant similarities between the other act and the charged act, as well as the temporal and spatial proximity, that inference did not depend on impermissible character-based reasoning.

Affirmed.

On remand from the Oregon Supreme Court, *State v. Taylor*, 369 Or 675, 508 P3d 501 (2022).

Benjamin N. Souede, Judge.

David Sherbo-Huggins, Deputy Public Defender, argued the cause for appellant. Also on the briefs was Ernest G. Lannet, Chief Defender, Criminal Appellate Section, Office of Public Defense Services.

Patrick M. Ebbett, Assistant Attorney General, argued the cause for respondent. Also on the briefs were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before Shorr, Presiding Judge, and Mooney, Judge, and Pagán, Judge.

PAGÁN, J.

Affirmed.

PAGÁN, J.

In this criminal appeal, defendant contests his conviction for third-degree sexual abuse. In a single assignment of error, defendant asserts that the trial court erred by admitting other-acts evidence under OEC 404(3).

This case is before us on remand from the Supreme Court. When this case was previously before us, we concluded that the challenged other-acts evidence was admissible under a "spurious plan" theory of noncharacter relevance and we affirmed. *State v. Taylor*, 315 Or App 608, 501 P3d 7 (2021), *vac'd and rem'd*, 369 Or 675 (2022) (*Taylor I*). The Supreme Court vacated and remanded our previous decision for reconsideration in light of *State v. Jackson*, 368 Or 705, 498 P3d 788 (2021). *See State v. Taylor*, 369 Or 675, 508 P3d 501 (2022) (*Taylor II*). Now, using the analysis of *Jackson*, 368 Or at 733, we conclude that the state, as proponent of the challenged evidence, sufficiently "articulate[d] the chain of inferences that makes the evidence relevant to [an identified] purpose and explain[ed] how that chain of inferences does not depend on the actor's character." Accordingly, we affirm.

We review a trial court's determination of relevance under OEC 401 for errors of law. *State v. Stockton*, 310 Or App 116, 123, 483 P3d 657 (2021). Likewise, we review a trial court's determination that other-acts evidence is relevant and admissible under OEC 404(3) for legal error. *Id*. In the procedural history of this case, the challenged evidence was deemed relevant and admissible under OEC 404(3) during a pretrial hearing, thus our review is limited to the record that was before the trial court at that time. *State v. Warren*, 291 Or App 496, 510, 422 P3d 282, *rev den,* 363 Or 744 (2018). Regardless of the ultimate OEC 404(3) avenue that the proponent of other-acts evidence seeks for admission, the proponent must articulate a "theory of relevance that connects the evidence to the fact of consequence." *Jackson*, 368 Or at 717. When called on to consider other-acts evidence, a court cannot "simply look for the proponent's identification of a noncharacter material fact that permits use of other acts as proof," such as those purposes enumerated in OEC 404(3), and "for some probative value of that evidence

that is connected in any way to the identified purpose." *Id.* at 733. Rather, the proponent of the evidence must meet its "burden to establish that it is offering a theory of relevance for the evidence that does not depend on character-based reasoning prohibited under OEC 404(3)," by explaining first why the evidence is relevant to that theory and second how the "chain of inferences does not depend on the actor's character." *Id.*

## BACKGROUND

While we often refer to prior opinions for background when a matter is remanded from the Supreme Court, we provide a more detailed discussion of the evidence here because the particulars of the proceedings below are relevant to the updated analysis on remand.

One afternoon, J was studying on the first floor of the library of her community college. While she was sitting at a table divided into study carrels, defendant sat down next to J. He slowly encroached on J's space, causing her to "stomp[] on his foot at one point" to assert her space. Even after doing so, the encroachment continued, and ultimately, "[J] felt [defendant's] hand reach under [the desk] and touch [J's] vagina, sort of around the pubis." J stood up, got her schoolbooks, and moved to a different table. A few minutes later, J texted a friend about the touching, and after an exchange of text messages, J reported the incident to a librarian and campus security.

Before trial, defendant sought to exclude a security video from upstairs in the library, that was recorded minutes before the encounter with J. According to defense counsel, that video would show

> "that [defendant] went upstairs. He selected a book. He sat down in a cubicle next to a woman. He got up and then went back. And then over the course of about 30 minutes, his leg extended over towards the woman and then was near the woman for a while. And then she got up and left.
>
> "And then a couple minutes later, [defendant] got up and left and then he walked downstairs and he sat down next to [J]."

Defendant denied any contact with the woman shown on the video. The state did not identify that woman or call her as a witness, but nevertheless charged defendant with third-degree sexual abuse and harassment related to the upstairs encounter. Although not relevant to our ultimate decision, defendant waived a jury trial on those two charges and was granted a motion for judgment of acquittal on both counts.

As for the charges related to J, defendant argued that the video was not relevant to any fact at issue with respect to the encounter involving J. Defendant further contended that the jury would be confused by the challenged video evidence because "[it] doesn't show any crime has been committed," and so it should be excluded as unfairly prejudicial under OEC 403. Finally, defendant claimed that the challenged video evidence was "pure propensity" and should be excluded under OEC 404.

The state countered that the video, as evidence of prior actions, was relevant to show defendant's intent, meaning defendant engaged in knowing conduct, that touching J was not a mistake, and to demonstrate defendant's motive, plan, and preparation. The state added that the video was consistent with J's testimony, with both incidents occurring in the same library, on the same day, and, while on different floors, the study carrel set up was nearly identical.

Because *Jackson* requires the proponent of the other-acts evidence to articulate the chain of inferences that support admission of other-acts evidence, we recount in more detail the exact arguments the state made during the hearing.

The state initially described the upstairs video as occurring "in a section of the library similar to the study cubicles [where J sat,] *** [t]he same day at the same library, roughly the same time, just, you know, I think shortly before the conduct involving [J]." The state then contended that defendant engaged in conduct that was very similar between the uncharged act and the charged act, which tended to corroborate J's account of the charged act.

When pressed by the trial court to explain "the fact at issue," the state explained: "It goes to intent, Your Honor.

It goes to intent. Okay. The state has to show *** that the defendant engaged in knowing conduct[,] *** [t]hat he knowingly or intentionally subjected [J] to sexual contact." The court then asked for an explanation for why the similarity of conduct—sitting next to a woman and encroaching in her space—made it "more or less likely that [defendant] committed the element of the crime—the elements of the crime that he is charged with here? *** So what is the intent that his decision to sit next to a different woman and invade her space, what is the intent that is related to the charged criminal activity that you think it corroborates?"

The state responded that looking at the alleged sexual touching "in isolation" would miss the point. "You have to look at everything that happens up to that point. *** It is a progression. It is a buildup to what is then the ultimate violation." The state continued that it needed to show that "defendant's conduct here was not by mistake." A little later, the state added, "It is the buildup to it that is important, because [defendant] does the exact same buildup ***, because the only thing that's different in the upstairs example is that the person leaves."

The court noted that the state had still not connected things in a way other than "it's sort of creepy if a person walks around a library sitting too close to women who are alone and studying," but that it understood the state was not offering to "prove that the defendant is just a creepy guy who has a propensity to do this." The state responded that its theory of the case involved "someone who is finding women who are alone. *** And then it is a slow progression, almost—I'm not going to call it a grooming exercise *** but of that nature."

The court asked, "[I]f we have a thousand instances where he's intentionally sat too close to women, why does that make it more or less likely that when he allegedly reaches over and touches them with his hand, that that is done intentionally or not intentionally?" The state again responded that "taking everything in isolation" would miss the connection and that J was "telling an entire story and that the only—and that at the end—it is only that end, the last chapter is where he touches her with his hand."

A little later in the colloquy, the state contended that because of the "close in time" relationship between the two acts, the other-acts evidence was relevant to show defendant's motive and "lack of mistake" in touching J. The state then argued that "I think it also goes to *** plan and preparation, which are both identified in [OEC] 404(3), because, like I said, the—conduct involved is *** very consistent between the two individuals."

After reviewing the video, the court concluded that it was admissible, stating, "Having watched the video confirmed my earlier inclination. I find that the video is relevant and is relevant for a nonpropensity purpose, for purposes, that is, to prove motive, plan, preparation and *** absence of mistake." The court continued, "the motive part being to be seated close enough to a woman sitting alone to allow for, at the very least, putatively incidental touching and potentially would allow for more than incidental touching."

Defendant argued that admission of the video would be more prejudicial than probative because the video failed to show any criminal activity and could be misused by the jury. In response, the state argued that the video was highly probative, in particular because it demonstrated defendant's motive, intent, and plan to get close enough to a woman sitting in a cubicle to be able to touch her. The state noted:

> "He is progressively getting closer and closer into the unknown woman's space. Then when she finally does get up and leaves, he doesn't stay in the exact same position. He actually does withdraw a little bit. He then starts kind of looking around. And shortly after she leaves, he gets up and leaves."

Following that argument, the trial court engaged in an OEC 403 balancing analysis and concluded that a limiting instruction would be sufficient to mitigate any potential prejudice from the video.

During the trial, the challenged video evidence was played to the jury during the state's case and during the state's cross-examination of defendant. Defendant was convicted of third-degree sexual abuse, ORS 163.415, and timely appealed.

## ANALYSIS

Consistent with our instructions on remand from the Oregon Supreme Court, we consider how *Jackson* applies. In supplemental briefing, defendant argues that *Jackson* precludes the admission of *any* evidence under a spurious plan theory. As we discuss below, we reject that categorical reading of *Jackson*.

In requiring the proponent of the other-acts evidence to identify the inferences it desired the factfinder to draw and to explain why those inferences carried a noncharacter link, *Jackson* has shifted our traditional paradigm for review in other-acts evidence cases. Prior to *Jackson*, we would independently analyze the challenged other-acts evidence under the purposes accepted by the trial court, and search for *any* noncharacter inference that would support admission of the evidence. *Compare Jackson*, 368 Or at 730 (setting out the proponent's articulated chain of inferences) *with Taylor I*, 315 Or App at 616-23 (explaining inferences that jury could conceivably draw).

Thus, we understand our task to have shifted. As we have in the past, our review is limited to the noncharacter theories of relevance under which the trial court admitted the evidence. However, our review must be further limited to the chain of inferences that the proponent of the other-acts evidence articulated. *See Jackson*, 368 Or at 733.

As *Jackson* makes clear, this formulation is necessary to guard against hidden character-based reasoning. *Id*. at 731-33 (analyzing proffered inferences for character reasoning). This formulation also promotes the ability of the trial court to properly assess the probative value of other-acts evidence and balance it against the potential for unfair prejudice.[1] To the extent that defendant is now arguing that *Jackson* categorically precludes the admission of any "spurious plan" evidence, we reject that argument. Whether the parties use a label like "true," or "spurious" plan, *Jackson*

---

[1] We observe that most admissible other-acts evidence will carry both a character inference and a noncharacter inference. Assessing the relative strength of those inferences can best be accomplished when the trial court is fully apprised of the chain of inferences that connects the other-acts evidence in a manner that is permissible.

requires the trial court to examine the actual evidence and what inferences are necessary for a factfinder to draw in order to reach the conclusion the proponent seeks, regardless of what label the proponent used for the evidence. *See id.* at 733.

From the colloquy between the state and the court in the pretrial hearing, we understand that the state sought to admit the other-acts evidence to prove two separate facts at issue. First, by arguing that the acts depicted in the video and the charged act were part of a common plan to sexually assault women on that day, the state contended the evidence was relevant to show that the *actus reus* of the charged crime occurred. That is, the state argued the video demonstrated the "progression" of defendant's plan by showing his failed attempt to commit the same act minutes prior to the incident with J. Second, the state contended that the common plan made it more likely that when defendant touched J, he did so with a culpable mental state. The trial court accepted those premises and admitted the other-acts evidence for "plan," "motive," and "absence of mistake" purposes. Ultimately, because we conclude that the evidence was admissible under a plan theory, we need not discuss whether it would have been admissible to establish motive or absence of mistake.

Plan, as a theory of other-acts relevance, is divided into evidence tending to show what courts have called a "true plan" or a "spurious plan." *State v. Turnidge (S059155)*, 359 Or 364, 439, 374 P3d 853 (2016), *cert den*, 580 US 1070, 137 S Ct 665 (2017). In a true plan scenario, the other-acts evidence is offered to show that the defendant formed a plan, including the charged and other acts, "as stages in the plan's execution." *Id.* (internal quotation marks omitted). In contrast, evidence of a spurious plan consists of other-acts evidence "offered to show that a defendant engaged in a pattern or systematic course of conduct *from which* the existence of a plan is to be inferred." *Id.* (emphasis in original).

In this instance, the state did not specifically argue that defendant had a true plan, where the other act and the charged act were individual steps in a broader plan. Rather, the state argued that the other act depicted a preparatory step or "trial run" for the charged act. Although the trial

court admitted the other-acts evidence as relevant to show, among other theories, "preparation," in Oregon, evidence bearing that relationship has been analyzed under the true plan theory of relevance. *Cf. Turnidge*, 359 Or at 441 (bomb threat made 13 years before charged bombing relevant to show trial run for charged act); *State v. Brown*, 217 Or App 330, 339, 176 P3d 400 (2007) (evidence demonstrated preparatory steps of targeting a certain class of individuals). Additionally, the state argued that a factfinder could infer from the prior conduct that defendant was executing a plan to sexually abuse a woman—any woman—in the library by using the proximity of the seats at the cubicles, which would corroborate J's testimony about defendant's conduct after the events in the video. Ultimately, we understand that the state was offering the other-acts evidence as relevant to show both preparatory steps or a "trial run" under the true plan theory and as relevant to provide a basis for inferring that defendant had a plan to sexually assault women in the library on that day—in other words, a spurious or unlinked plan. Because we conclude that the evidence was admissible under the spurious plan framework, we will not discuss whether the evidence would support a true plan inference.[2]

In the general framework for a spurious or unlinked plan noncharacter theory, we ask a factfinder to deduce a plan from a series of similar acts. The existence of a plan is the linking factor between the events. Under a spurious plan theory, we focus on whether the temporal and spatial relations of the prior incident and the charged incident, along with the similarity in conduct, allow for a reasonable inference that an individual had a design or plan and was in the process of executing it. *See State v. Leistiko*, 352 Or 172, 188-89, 282 P3d 857, *adh'd to as modified on recons*, 352 Or 622, 292 P3d 522 (2012), *abrogated in part on other grounds by State v. Jackson,* 368 Or 705, 721, 498 P3d 788 (2021) (discussing the theories of what threshold of similarity is required to use prior conduct to establish a common design).

---

[2] As we noted in *State v. Travis*, 320 Or App 460, 470, 513 P3d 614 (2022), the specific labels, such as true plan, spurious plan, or preparation, are not dispositive to questions of admissibility, but "[n]onetheless, those labels, if used precisely, can at least serve a valuable calibration point to ensure the meaning intended by the advocate is the meaning received by the court."

Throughout the colloquy at the pretrial hearing, the state compared the similarity of the upstairs encounter and the charged act. The state highlighted factors such as the virtual identity of time, place, and conduct leading up to the alleged touching, noting that defendant "does the exact same buildup * * *, because the only thing that's different in the upstairs example is the person leaves." The state further argued that the prior incident was relevant because, when the woman left, defendant reacted in a manner that demonstrated dissatisfaction, suggesting that the woman's leaving frustrated defendant's purpose. We thus understand that the state was offering the other-acts evidence as relevant to show that, due to the similarity of features between the two acts, defendant had a spurious or unlinked plan. That is, the state asked the factfinder to infer a plan to sexually abuse somebody from the proximity in time and space and based on the similarity of the other act and the charged act. Pursuant to *Jackson*, that is sufficient to discharge the first step of articulating the desired inferences to make the other-acts evidence relevant. *Jackson*, 368 Or at 733.

We turn to the second step of *Jackson*—whether the state explained why the inferences did not rely on character reasoning. To be clear, in this case, neither the identity of the perpetrator nor a claim of accidental touching was at issue, thus the plan evidence was not required for identity or intent. The only fact at issue, at least at the time of the pretrial hearing, was whether defendant committed the *actus reus* of the charged act.[3] *See State v. Pitt*, 352 Or 566, 580, 293 P3d 1002 (2012) (relevance assessed as of the time of the motion *in limine* deciding admissibility of other-acts evidence). "[A] plan to do an act is relevant to prove that the defendant in fact acted pursuant to that plan." *Leistiko*, 352 Or at 187.

Here, the state sought to introduce the evidence of the upstairs encounter to show, first, that defendant had a plan to sit near women in a bid to sexually abuse them, and

---

[3] Other-acts evidence relevant to show a plan would tend to prove both intent and that an individual acted in accordance with that plan. *State v. Hudman*, 279 Or App 180, 189-90, 379 P3d 659 (2016).

*because* defendant had that plan, the jury should *infer* that defendant's conduct with J was consistent with that design. *See Turnidge*, 359 Or at 440 (explaining logical framework to make spurious plan evidence relevant). Identifying what character inference could be drawn from the video tends to support the state's position. Character evidence requires a factfinder to infer that a defendant *tends to do something in particular circumstances. Jackson*, 368 Or at 716 ("In evidence law, character means a person's disposition or propensity to engage or not to engage in certain types of behavior." (Internal quotation marks omitted.)). During the hearing, the trial court repeatedly asked what character inference could be drawn from the video, particularly when defendant's position was that the video did not demonstrate any criminal activity. In response, defendant argued that the jury could infer that defendant had a tendency to sit too close to women or to "manspread" when seated next to someone. But the state did not want the jury to infer either of those things, as such inferences would suggest innocuous, accidental conduct. Rather, the state's focus was on defendant's plan or design, *on that day, in that place*, to sit near women, slowly encroach on their space, and finally, touch them in a sexual manner. While it is arguable whether a factfinder is actually using propensity in that circumstance—if a person has a plan, they have a tendency to act in conformity with it—applying propensity reasoning to such temporally and spatially related actions would atomize the principle to its unreasonable end.

We could analogize to an individual who is arrested for breaking into a vehicle. If the state had a video of that individual attempting to open various car doors on a street, but the individual left the viewpoint of the recording, and the state offered a witness who testified that minutes later the same individual broke into a car on that same street within the witness's view, we would no doubt find that evidence admissible. The theory of admission would be the same as the state offered in this case: The video is evidence of the individual's actions immediately preceding the criminal incident, demonstrating that, at that time, and at that place, the individual was executing what could reasonably be inferred to be a plan to break into a

vehicle.[4] However, if the video of the individual was from a different street, on a different date, the use of that video to inculpate that individual would necessarily require a propensity bridge, because the jury would have to conclude that the individual had a propensity to engage in such conduct, so it is likely they engaged in that conduct at the time of the alleged criminal activity. The jury's use of spatial and temporal relations to make a determination about the likelihood that the accused was present, able, and intentionally engaging in the criminal conduct would be significantly minimized in the second scenario.

In assessing the similarity of the other act and charged act, the proponent must show "not merely a similarity in the results, but such a concurrence of common features that the various acts are naturally to be explained as caused by a general plan of which they are the individual manifestations." *Leistiko*, 352 Or at 188 (internal quotation marks omitted; emphasis omitted). The factual scenario in the instant case is much more like the first hypothetical. When we have rejected other-acts evidence proffered to show an unlinked plan, the cases did not involve the nearly identical time, space, and conduct considerations that are present in this case. *See, e.g.*, *State v. Hudman*, 279 Or App 180, 188-89, 379 P3d 659 (2016) (physical similarity between other act and charged act insufficient); *State v. February*, 253 Or App 658, 667, 292 P3d 604 (2012) (significant differences between the two situations). In the instant case, the overwhelming similarity between the two acts allows an inference not only of a general plan, but also that the conduct depicted in the other-acts evidence could reasonably be inferred as an attempt to sexually abuse the unknown woman.[5]

The inferences the state identified—those of an unlinked or spurious plan—did not require character

---

[4] As the strength of the noncharacter inference wanes in light of the increasing attenuation in similarity, the trial court should consider whether the probative value of the noncharacter inference is significantly outweighed by the character inference.

[5] The burdens of persuasion for admissibility of evidence and criminal liability are different. That is, even though the other-acts evidence was insufficient to support a conviction on the related counts, it does not follow that the evidence was not admissible.

reasoning to connect the other act to the charged act. The trial court did not err by concluding that the other-acts evidence was relevant and admissible for the purpose of proving defendant's plan.

Affirmed.