No. 139          February 28, 2024          193

IN THE COURT OF APPEALS OF THE
STATE OF OREGON

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

ERVAN RONELL HERRING,
*Defendant-Appellant.*

Multnomah County Circuit Court
18CR34525; A174188

Benjamin N. Souede, Judge.

Argued and submitted August 17, 2022.

Zachary Lovett Mazer, Deputy Public Defender, argued the cause for appellant. Also on the briefs was Ernest G. Lannet, Chief Defender, Criminal Appellate Section, Office of Public Defense Services.

Patrick M. Ebbett, Assistant Attorney General, argued the cause for respondent. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before Ortega, Presiding Judge, Lagesen, Chief Judge, and Powers, Judge.*

ORTEGA, P. J.

Reversed and remanded.

_____
    * Lagesen, C. J., *vice* Hellman, J.

## ORTEGA, P. J.

Defendant appeals from a judgment of conviction for attempted first-degree assault with a firearm, unlawful use of a weapon with a firearm, and felon in possession of a firearm with a firearm in connection with a daytime shooting outside a Portland hospital.[1] On appeal, defendant raises 11 assignments of error. The first eight challenge the trial court's rulings admitting evidence of his gang affiliation under OEC 404(3), as relevant to showing his motive for the charged acts; the ninth challenges the denial of his motion for a new trial based on admission of the gang evidence; the tenth challenges the trial court's admission of evidence found in his codefendant's house; and the eleventh challenges the court's instruction to the jury that it could convict defendant without reaching a unanimous verdict.

We agree with defendant that the trial court erred in admitting the state's proffered evidence regarding his gang affiliation, because the state failed to meet its burden to establish that it was offering a theory of relevance for the evidence that does not depend on propensity reasoning. We further conclude that the error warrants reversal. Our disposition obviates the need to address defendant's second through ninth and eleventh assignments of error. However, because it is likely to arise on remand, we address defendant's tenth assignment and conclude that the trial court did not err. We therefore reverse and remand for further proceedings.

## I.   GANG EVIDENCE

### A.   *Standard of Review*

"OEC 404(3) is an inclusionary rule that allows trial courts to admit other-acts evidence on any theory of logical relevance that does not depend on propensity-based reasoning." *State v. Morrow*, 299 Or App 31, 33, 448 P3d 1176 (2019) (internal quotation and citations omitted). We review a trial court's ruling to admit evidence of uncharged misconduct as relevant to a nonpropensity purpose under OEC 404(3) for errors of law and in light of the record that

---

[1] Defendant was jointly charged and tried with his brother, who waived jury and was acquitted on all charges by the trial court.

was before the court at the time it made its decision. *State v. Taylor*, 326 Or App 396, 398, 532 P3d 502, *rev allowed*, 371 Or 509 (2023).

B.   *Procedural and Historical Facts*

The state filed a pretrial motion to "allow gang evidence" under OEC 404(3) and asked the court to conduct an OEC 104 hearing "to determine the admissibility of certain gang evidence" against defendant.[2] In its motion, the state represented that defendant is a member of "a violent criminal gang" known as the Woodlawn Park Bloods and has been associated with that gang for at least 20 years; that defendant has criminal convictions related to his gang involvement; that the Woodlawn Park Bloods have "a longstanding violent feud with various Crip gang sets"; that the victim, S, has a longtime association with Crip gang members; and that S was convicted of killing defendant's youngest brother, who had been an associate of the Woodlawn Park Bloods. The state further represented that, on the day of the shooting, defendant's family member and gang associate was at the hospital receiving treatment for gunshot wounds; that S's grandmother was also at the hospital; that defendant attempted to murder S as he walked into the hospital that afternoon; and that the hospital surveillance footage showed that codefendant was wearing black and red, and that S was wearing blue, color choices that reflected their gang affiliations.

The state explained in its motion that it was "seeking to admit defendant's prior gang associations, prior crimes against rival gangsters, and prior crimes committed by the Woodlawn Park Blood gang and perpetrated against Crip [g]ang members" as well as "the victim's prior gang associations, prior crimes against rival gangsters, and prior crimes committed by Crip [g]ang [m]embers against Woodlawn Park Blood gang members and/or associates" to show defendant's motive for the charged act: "[D]efendant's gang, the Woodlawn Park Bloods, are at war with the intended victim's gang, the Crips, and they are hostile towards this class

---

[2] The state sought to admit gang evidence relating to both defendants, and many of the defense arguments were made by codefendant's counsel, which defendant expressly joined. For simplicity, we refer to the evidence as relating to, and arguments made by, defendant only.

of victims, in addition to this particular named victim." The state argued that, "[b]ecause the evidence is being presented to show motive and not impermissible character evidence, the defendants should not be allowed to insulate the trier of fact from their gang membership, gang tendencies, and violence their gangs perpetrate." Specifically, the state argued that "the defendants' gang association, the [codefendant's] prior attempt to kill the victim, and the victim's prior murder of the defendants' gang associate and family member is relevant to prove that they had a similar motive when they attempted to murder [the victim]."

The state proffered that Officer Charles Asheim would "testify to the facts and circumstances of the defendants' gang associations and prior assaults by the defendants and their gang," which would be "coupled with the fact that the defendants and their fellow gang members were previously indicted and convicted with crimes related to this attack."

Finally, the state argued that the probative value of the gang evidence was not substantially outweighed by unfair prejudice, because "without understanding the defendants' gang association, gang lifestyle and their hostile motive toward this class of victims, the rival gang members, the jury might be misled because understanding an act like this will make no sense absent a full picture of modern gang rivalry and warfare." The state explained that its

> "purpose in offering this evidence is to prove why the defendants would attempt to gun down the victim in broad daylight as the victim walked into a hospital. A heinous event such as this is outside the norms of what a layperson can comprehend without attempting to understand the intricacies of modern gangs and gang warfare, specifically involving the Crips and the Woodlawn Park Bloods."

At a hearing before Judge Roberts, the state reiterated its intent to offer gang evidence through the testimony of Asheim, "specifically to address the background with each one of these defendants as far as what is their gang affiliation, what does it mean to be a gang member, and then, more particularly, how is it applicable to the events that occur on [the date of the charged acts]." The state explained that the

evidence was important to understanding the events on the date of the charged acts, "in particular the rivalry, the intense kind of reasons behind why an individual who is a gang member would want to engage in this type of behavior, and look at it from that—through that lens."

Defendant responded that it was "unclear" exactly what evidence the state was seeking to introduce, but that it appeared to be "a broad scope." Defendant agreed that evidence that the victim had been convicted of killing one of his brothers was relevant and admissible motive evidence but argued that "all the gang history and gang rivalry and all this other speculation to it, is more propensity and painting the defendant in a bad light." Defendant further argued that, because of the specific motive evidence regarding the victim's murder of his youngest brother, the state's need for the additional gang evidence was low and that the evidence was "extremely prejudicial" because "it really is propensity evidence by another name."

The state replied that "motive is a huge factor because understanding for the everyday juror why would someone in daylight at a hospital start trying to shoot and kill another person is a very important fact," that "understanding the dynamics that go into gang warfare, modern gang warfare, the rivalry that goes on with that, the longstanding disputes, why that is so volatile and violent is the motive that is behind this," and that it "intends to bring in this expert witness to provide the background information that is necessary to understand that."

After confirming that the state was not offering the evidence for propensity, the court ruled that the gang evidence was relevant to motive:

> "A relevant purpose of evidence showing gang membership, showing gang rivalry in general between the two gangs, and showing that that rivalry in the gang culture is expressed in terms of, 'He shoots at us, we shoot at him,' that sort of thing.

> "That much seems to me relevant evidence to explain why—the State's version of why this episode occurred, and why the defendants would be people who have a motive to engage in it.

"The fact that they have another personal motive, because [the victim killed] their brother, doesn't make it not relevant."

The court further ruled that the probative value of the evidence outweighed the danger for unfair prejudice but explained that it intended "that the evidence be tailored to minimize any such unnecessary prejudice" once the state submitted an offer of proof of Officer Asheim's testimony at an OEC 104 hearing. The court concluded that, "in general for both sides, the evidence that I would admit is, first of all, gang membership of the parties believed to be involved; the existence of the rivalry between those gangs; gang culture; [and] establishing the kind of way that rivalry is expressed in terms of violence" but that it "would not allow specific bad acts by individuals."

The case was later reassigned to Judge Souede, who reviewed and expressly adopted Judge Roberts's reasoning and ruling on the record before the state put on an offer of proof of Asheim's expert testimony. The court then ruled on the admissibility of specific elements of Asheim's testimony under OEC 404(3) and 403 in response to defendant's additional objections and argument that the state was attempting to build a "gang profile."

At trial, the state presented largely circumstantial evidence of the charged acts that consisted of testimony by eyewitnesses and police experts, as well as hospital surveillance footage. The surveillance footage did not capture the shooting itself but clearly shows defendant, who was wearing all black, and codefendant entering the hospital that afternoon and returning to the parking lot minutes before the shooting, as well as the victim running into the hospital immediately after the shooting. A police detective compiled footage from the parking lot and opined as to the movements of defendant and three cars he believed were associated with defendant, including a black Mercedes, before and after the shooting.

The victim, who was convicted in 2002 of first-degree manslaughter for the 1997 killing of defendant's brother, initially confirmed that he ran inside the hospital when he heard shooting and did not see who was shooting

at him. He then testified that he did not hear gunshots but rather heard what sounded like firecrackers and that he just "heard noise and ran." Three eyewitnesses described seeing a Black man in dark clothes shoot at the victim, who ran toward the hospital emergency room. One of those eyewitnesses, a paramedic, wrote down the license plate number of the black Mercedes that he saw the shooter drive away in and later reported it to police. A hospital employee heard gunshots and saw two vehicles leave the parking lot and shell casings in the area where those vehicles had been. No witness identified defendant as the shooter.

When police arrived, officers found six .40 caliber shell casings in the parking lot and two bullet strikes on the hospital building. Forensic analysis of the casings determined that they were all fired from the same gun, likely a Glock. Three months after the shooting, police found a Glock handgun, several Glock magazines of various sizes, a Glock box, and .40 caliber ammunition in codefendant's home. The Glock handgun did not match the serial number on the Glock box or the shell casings found at the hospital. Police also found several red Washington Nationals hats in the trunk of codefendant's car and in defendant's home.

The day before the shooting, defendant's wife had obtained a loaner car from a Mercedes dealer with the same license plate number the paramedic had reported to police. Defendant had previously been convicted of a felony.

Asheim, who has worked on gang enforcement teams for eight-and-a-half years and has received training about gang intelligence and enforcement at regional and national conferences put on by professional associations, the Oregon Department of Justice, and the United States Department of Justice, testified to the following facts and opinions at trial. Asheim builds intelligence about criminal organizations in the City of Portland by sharing information with other gang investigators, proactively patrolling areas where gang crimes have been committed or gang members congregate, and talking to people involved in gangs. Asheim's team has investigated more than 1,000 incidents of gang violence, and well over 90 percent of those incidents involve firearms.

According to Asheim, gangs are "street organizations" or criminal organizations that are a subset of all criminals. He opined that gangs hold different values than people who are not involved in crimes and live by specific codes and ethics, including showing allegiance to their members and sharing common culture, symbolisms, and alliances. Gang subsets or "sets" also have specific symbolisms, such as tattoos and baseball hats, that identify them and their allegiance within the larger organization. Asheim explained that gangs "preach" loyalty and respect to their members and noted that, in his experience, gang members usually do not cooperate with law enforcement and do not want to be named in police reports, because people that have been known to talk to police are later murdered for doing so.

According to Asheim, all criminal gangs gain power and notoriety through the willingness to do violence. Senior ranking gang members, known as "Original Gangsters" or "OGs," are longtime members that have "survived," continue to show allegiance to the gang, and hold a position of authority and respect. He explained that "gangsters" or "Gs" are members who are willing to go out and "ride" for the gang, that is, do violence and shootings for the gang, which gains them power and respect within the gang and from allied gangs. According Asheim, gang members commonly have a "hood name" or "street name" that they go by within the criminal organization. Such aliases have a lineage, beginning with the "Big Homey" who started out with the name, followed by others who follow under that lineage, who may be called "Little," "Baby," and "Tiny."

Asheim explained that the Bloods and Crips are gangs based in Los Angeles that have operated in Portland since the 1980s. The Woodlawn Park Bloods and Kirby Blocc Crips are local Portland gang sets within their respective larger organizations and are rivals. They historically were based around a geographical neighborhood but that has changed with gentrification. The original rivalry between the Woodlawn Park Bloods and Kirby Blocc Crips goes back 30 years, according to Asheim, and has involved homicides.

Bloods wear red and Crips wear blue. Asheim noted that the Woodlawn Park Bloods favor Washington Nationals

hats or "dub caps," and Kirby Blocc Crips like Kansas City Royals hats. Displaying "CK," which stands for "Crip Killer," or "BK," which stands for "Blood Killer," shows that the person has killed someone or is "about killing their enemy," according to Asheim, and therefore shows disrespect to an enemy gang and promotes violence the person's gang needs to gain power.

Asheim opined that defendant and codefendant are both members of the Woodlawn Park Bloods[3] and that the victim was a member of the Kirby Blocc Crips in the 1990s. Defendant's "hood name" is "Foxxy" or "Big Foxxy." Asheim described the significance of several of defendant's tattoos: "Original" is tattooed across his stomach, which shows that he is an "OG" in the Woodlawn Park Bloods and takes pride in that status; two "rest in peace" tattoos on defendant's left arm memorialize slain gang members, including his brother; "Woodlawn" is tattooed from shoulder to shoulder on defendant's back, which shows the depth of his allegiance to the gang; and "Foxxy" is tattooed on defendant's right arm above a grim reaper holding an hourglass.

The jury found defendant guilty of attempted first-degree assault with a firearm and unlawful use of a firearm with a firearm. The trial court found him guilty of felon in possession of a firearm with a firearm and later denied defendant's motion for a new trial. This appeal followed.

In his first assignment of error, defendant challenges the trial court's ruling admitting gang evidence to prove motive. We understand that assignment to focus on the court's pretrial ruling admitting evidence of the parties' gang membership, the existence of a violent rivalry between defendant's gang and the victim's gang, and gang "culture." Because we agree that that ruling was in error, we do not address defendant's second through eighth assignments that challenge particular aspects of Asheim's testimony and related exhibits, or his ninth assignment of error relating to his motion for a new trial.

---

[3] After Asheim's testimony, defendant stipulated that he became a member of the Woodlawn Park Bloods in 1998 at the age of 15 and remained a member at the time of trial. He proposed that stipulation to forestall the state calling a second police gang expert to provide testimony about defendant's specific history of gang activity.

C.  *OEC 404(3) Framework*

Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." OEC 401. Relevant evidence is generally admissible unless it is prohibited by law or another provision in the Oregon Evidence Code. OEC 402. One such limitation is OEC 404(3), which provides that "[e]vidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show that the person acted in conformity therewith."

"In evidence law, 'character' means a person's disposition or propensity to engage or not to engage in certain types of behavior." *State v. Jackson*, 368 Or 705, 716, 498 P3d 788 (2021) (internal quotation marks and citations omitted). Under OEC 404(3), uncharged misconduct evidence may not be used "to argue that the defendant has either a general propensity to engage in misconduct or a specific propensity to engage in misconduct like the charged crime and, therefore, it is more likely that the defendant committed the charged crime." *State v. Skillicorn*, 367 Or 464, 476, 479 P3d 254 (2021). Evidence of a person's character is not prohibited because character is irrelevant, but rather to "protect the fairness of trials and the accuracy of verdicts," because such evidence "is unfairly prejudicial and likely to be overvalued" by the finder of fact. *Id.* at 477-78.

OEC 404(3) further provides, however, that uncharged misconduct evidence "may *** be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." "The proponent of the evidence 'has the burden of showing that the proffered evidence is relevant and probative of some noncharacter purpose.'" *Jackson*, 368 Or at 716 (quoting *State v. Pitt*, 352 Or 566, 576, 293 P3d 1002 (2012)). In determining admissibility, the court must "focus on the proponent's theory of relevance that connects the evidence to the fact of consequence." *Id.* at 717. "Whether evidence has a noncharacter purpose is not determined solely by assessing whether the ultimate fact that the proponent seeks to prove is a fact about a person's character or propensity to commit

crimes." *Id.* at 716-17. Rather, "evidence may also be inadmissible, regardless of the ultimate fact to be proved, whenever the chain of logical relevance connecting the evidence to the fact it is proffered to prove relies on an inference relating to a person's character or propensities." *Id.* at 717 (internal quotation marks, citations, and brackets omitted). Put another way, OEC 404(3) precludes admission of evidence if the proponent's theory of relevance requires the factfinder to employ "propensity reasoning," which requires the factfinder "to rely on an inference about the defendant's bad character and resultant propensity to commit criminal acts[] at *any* link in the chain of logical relevance." *Id.* (Emphasis added.); *see also Skillicorn*, 367 Or at 482-83 (explaining that OEC 404(3) prohibits the admission of propensity evidence "even if the proponent asserts that it is being offered to prove, for example, 'intent' or 'absence of mistake or accident').

D.  *Motive Evidence*

Here, the state offered, and trial court admitted, the gang evidence as relevant to prove defendant's motive in committing the charged acts. Motive is "a cause or reason that moves the will and induces action, an inducement which leads to or tempts the mind to commit an act." *State v. Hampton*, 317 Or 251, 257 n 12, 855 P2d 621 (1993) (citation omitted). It is "a relevant circumstantial fact that refers to why a defendant did what [they] did." *Id.* Although motive "generally need not be established by the prosecution to prove guilt," it is "often pertinent as the basis to infer that the act was committed, or to prove the requisite mental state, or to prove the identity of the actor." *Id.*

We have explained that motive evidence "includes instances where the other-acts evidence directly supplies the motive for the charged crime, amounting to a cause-and-effect relationship," as well as instances where "the other-acts [evidence] and the charged crime are both explainable as a result of the same motive." *State v. Tinoco-Camarena*, 311 Or App 295, 302-03, 489 P3d 572, *rev den*, 368 Or 561 (2021) (internal quotation marks and citations omitted). But "[n]o matter what sort of motive evidence is offered, the proponent must be able to show that the other-acts evidence furnishes or exemplifies the motive without relying

on impermissible character inferences." *Id.* at 303; *see also Hampton*, 317 Or at 257 n 12 ("Of course, courts must be on guard to prevent the motive label from being used to smuggle forbidden evidence of propensity to the jury." (Internal quotation marks and citation omitted.)); *State v. Davis*, 290 Or App 244, 252, 414 P3d 887 (2018) ("Courts must be cautious in admitting evidence that is ostensibly for the purpose of showing 'motive,' but that may, in reality, depend for its relevance on an inference about the defendant's character.").

We have acknowledged "how difficult it sometimes is to distinguish between motive and character evidence," *Morrow*, 290 Or App at 43, and have noted that "most admissible other-acts evidence will carry both a character inference and a noncharacter inference," *Taylor*, 326 Or App at 403 n 1. "[A] crucial difference between permissible motive-based reasoning and a character-based theory of motive is that the former [permissible reasoning] assumes that a motive might exist because *any person* might possess one under those specific circumstances" whereas the latter impermissible reasoning "is based on inferred behavioral disposition or propensities and it relies upon a chain of inferences that employs the evidence to establish that the person (1) is more inclined to act or think in a given way than is typical, and (2) is therefore more likely to have acted or thought that way on a particular occasion." *Davis*, 290 Or App at 252-53 (emphasis in *Davis*; internal quotation marks and citations omitted). Ultimately, "the state has the burden of identifying a chain of logical relevance connecting" the uncharged misconduct evidence to a motive to commit the charged acts "without relying on inferences about [the] defendant's bad character and propensity to commit criminal acts." *Jackson*, 368 Or at 717.

E.   *Discussion*

With those legal principles in mind, we first pause to note what is *not* at issue on appeal: whether the fact that the victim killed defendant's youngest brother is relevant and admissible to show defendant's motive to commit the charged acts. Although the state included that evidence in its motion to admit gang evidence, defendant conceded that that particular evidence was relevant and admissible

motive evidence, and the trial court's ruling at issue on appeal admitted different evidence (the parties are members of rival gangs that express their rivalry through violence, and "gang culture") to prove a different motive (the state's broader theory of "why the defendants would attempt to gun down the victim in broad daylight as the victim walked into a hospital"). That is clear from the trial court's express ruling that the gang evidence is relevant to motive even if defendant has "another personal motive" as a result of his brother's killing.[4]

Properly understood, the evidence of defendant's uncharged misconduct at issue on appeal is his membership in the Woodlawn Park Bloods. The additional gang evidence that the trial court admitted (evidence of the violent rivalry between defendant's gang and the victim's gang and evidence of "gang culture") gives context and meaning to defendant's gang membership; thus, the relevance of defendant's gang membership also depends on the context and meaning with which the additional evidence imbued it.[5]

We turn to the state's theory of relevance that the trial court adopted in admitting the gang evidence and to the parties' arguments on appeal. The state offered the gang evidence to show that defendant held a hostile motive toward the class of victims to which the victim belongs, *viz.*, a member of a rival gang. As noted, the trial court admitted "evidence showing gang membership, showing gang rivalry in general between the two gangs, and showing that that rivalry in the gang culture is expressed in terms of, [violence]" to explain "the State's version of why this episode

---

[4] We also note that, while the state's theory of relevance for that "personal motive" evidence regarding the specific animosity between defendant and the victim is ostensibly gang-related, its relevance does not necessarily depend on the gang evidence: The victim killed defendant's brother; defendant was motivated to avenge his brother's death; therefore, defendant was more likely to have committed the charged act and to have done so with the requisite mental state. We express no opinion as to whether evidence of defendant's gang membership may be relevant and admissible under OEC 404(3) to show that motive because the state's theory of relevance was not limited to that motive.

[5] Indeed, the state argues that "providing Asheim's opinion that defendant was a member of a gang at war with the victim's gang would be virtually meaningless without contextual information about the gangs, their violent rivalries, and the hierarchies in which they operated."

occurred, and why the defendants would be people who have a motive to engage in it."

On appeal, the state contends that "evidence of the gang associations of the defendants and the victim, the history of the violent rivalry, as well as the particular circumstances of the shooting itself, allowed the inference that defendant's affiliation with the Woodlawn Park Bloods showed a potential hostile motive to commit the charged crimes" and that "[t]he inference that defendant's actions were motivated in part by the gang rivalry was *** a logical one on this record." The state relies on cases holding that evidence demonstrating a defendant's hostility toward a class of persons to which the victim belongs has "special relevance to the issue of a hostile motive." *State v. Moen*, 309 Or 45, 68, 786, P2d 111 (1990); *see also State v. Tena*, 362 Or 514, 521-23, 413 P3d 175 (2018) (holding that the logical relevance of other-acts evidence under a hostile motive theory that does not involve the same victim "requires proof that the motive for committing the other acts was that the other persons were members of the class to which the victim belongs"); *State v. Turnidge (S059155)*, 359 Or 364, 447-53, 374 P3d 853 (2016) (holding that evidence of the defendant's expression of anti-establishment and anti-law enforcement views was logically relevant to demonstrate his motive to plant a bomb that would result in killing law enforcement officers).

While that premise may be true, the state's argument ends there, and it does not attempt to meet its burden to articulate the logical chain of inferences required to infer from defendant's membership in the Woodlawn Park Bloods his hostile motive toward Crips in general. That is, the state fails to grapple with the legal standard articulated in *Skillicorn* and reaffirmed in *Jackson* that "[w]hether evidence has a noncharacter purpose is not determined solely by assessing whether the ultimate fact that the proponent seeks to prove is a fact about a person's character or propensity to commit crimes." *Jackson*, 368 Or at 716-17; *Skillicorn*, 367 Or at 476 ("Evidence is barred by OEC 404(3) if the chain of logical relevance connecting the evidence to the fact it is proffered to prove relies on an inference relating

to a person's character or propensities" (internal quotation marks, brackets, and citations omitted)). To the extent that the state argues that uncharged misconduct evidence is admissible under OEC 404(3) if it is relevant to prove an ultimate nonpropensity purpose, such as motive, regardless of whether the chain of intermediate inferences relies on propensity reasoning, we reject that argument as irreconcilable with *Jackson* and *Skillicorn*. OEC 404(3) precludes character evidence, even if it is highly probative, because it is unfairly prejudicial and likely to be overvalued by the factfinder. *Skillicorn*, 367 Or at 477-82; *see also Morrow*, 299 Or App at 41 ("[C]haracter evidence is generally excluded '*despite* its admitted probative value,' so as to 'prevent confusion of issues, unfair surprise and undue prejudice." (Emphasis in *Morrow*) (quoting *Michelson v. United States*, 335 US 469, 475-76, 69 S Ct 213, 93 L Ed 168 (1948)).

For his part, defendant primarily argues that the state's theory of relevance for the gang evidence relies on an impermissible propensity inference: that defendant belongs to a group of people (the Woodlawn Park Bloods) who behave violently, and therefore defendant behaved violently on the date of the charged acts. In support of his position, defendant points to our decision in *State v. Haugen*, 274 Or App 127, 360 P3d 560 (2015), *rev'd on other grounds*, 361 Or 284, 392 P3d 306 (2017), which addressed the admissibility of the defendant's gang membership to prove motive. Because we agree that *Haugen* is instructive, we turn to that case now.

In *Haugen*, the defendant and another man, Rives, assaulted the victim after Rives confirmed that the victim knew a former member of the Vagos Motorcycle Club who had become a "snitch" by testifying against other Vagos members several years earlier. 274 Or App at 128 and n 1. The defendant and Rives wore green attire that bore assorted Vagos logos. *Id.* The defendant moved to exclude as inadmissible character evidence two categories of evidence, both consisting of Vagos-related images and paraphernalia: (1) various Vagos gang imagery that the state had obtained from the internet exemplifying the group's beliefs, including hostility toward "snitches" and loyalty to the group (the internet evidence), and (2) photographs from Rives's home

depicting clothes with Vagos mottos and patches and a room with green walls featuring a symbol signifying Rives's gang name (the Rives evidence). *Id.* at 132-33. The state argued that the evidence was admissible to prove the defendant's motive because it showed the Vagos "belief system" or "creed" that Vagos members "live by," and that the defendant, a self-identified and "patched" Vagos member, held that belief system, including loyalty to the gang and hostility toward "snitches." *Id.* at 134-35. The trial court denied the motion, explaining that the Vagos gang evidence showed that the defendant was a Vagos member and had a motive for the assault based on that membership, and that the state was entitled to present evidence about the Vagos "lifestyle" and "credo" regarding loyalty to the organization and its "anti-snitch" philosophy. *Id.* at 135-36. The trial court concluded that the evidence "is character evidence, but it's relevant character evidence." *Id.* at 137.

On appeal, the state offered the following theory of relevance as to the defendant's motive to assault the victim: "Vagos hate snitches and are loyal to one another, both Rives and [the] defendant were Vagos members, Rives had a problem with the victim because the victim was friends with a snitch, and [the] defendant initiated the assault on the victim out of loyalty to Rives." *Id.* at 151-52. In other words, the state "wanted the jury to infer from the fact that [the] defendant had joined a group holding particular beliefs that he held those beliefs himself," which motivated him to commit the charged assault. *Id.* at 152.

Beginning with the internet evidence, we first concluded that that evidence was relevant to the defendant's motive because it was "illustrative of the Vagos belief system, including the importance of being loyal to gang 'brothers' and taking violent action against 'snitches'" and "thus tends to explain why [the] defendant, a self-described Vagos member, would have felt justified in assaulting the victim, who was a friend of a 'snitch.'" *Id.* at 153. In reaching that conclusion, we rejected the defendant's argument that the internet evidence was irrelevant because the state had failed to establish a connection between the proffered evidence and the defendant. *Id.* at 151-52. We reasoned that "if

a person belongs to a defined group, evidence of that group's beliefs or tenets may be admissible to show that the person acted in accordance with those beliefs or tenets, 'even without proof' that the person has specifically or expressly adopted them." *Id.* at 152 (quoting *United States v. Abel*, 469 US 45, 52-53, 105 S Ct 465, 83 L Ed 2d 450 (1984)).[6]

        We then concluded that the internet evidence was character evidence. We explained:

> "In offering evidence of the Vagos' tenets, the state urged an inference that, because [the] defendant was a member of the Vagos, [the] defendant had personally adopted those tenets and lived by them. The state wanted the jury to conclude that [the] defendant acted in accordance with those tenets in committing the assault. Because the state offered the internet evidence to convince the jury that [the] defendant's behavior on a specific occasion conformed to a set of beliefs or values that [the] defendant held, that evidence was character evidence of [the] defendant's motive."

*Id.* at 155. In so concluding, we rejected the state's argument that, because the internet evidence was offered to prove that the defendant acted out of loyalty to a particular person at a particular time rather than to prove that he is a loyal person in all varying situations in life, it was not character evidence at all. *Id.* at 154 ("In our view, the state defines character evidence too narrowly.").[7] Finally, we concluded that

_____

[6] As defendant points out, *Abel* did not involve the admissibility of uncharged misconduct evidence or of gang affiliation as substantive evidence of guilt, but rather held that evidence of the defendant's and a defense witness's membership in the same gang—and the tenets of the gang—were relevant and admissible to prove the defense witness's possible bias in favor of the defendant. 469 US at 52 ("A witness' and a party's common membership in an organization, even without proof that the witness or party has personally adopted its tenets, is certainly probative of bias."); *see also id.* at 53 ("For purposes of the law of evidence the jury may be permitted to draw an inference of subscription to the tenets of the organization from membership alone."). We noted that *Abel* was "persuasive authority for this court in applying the Oregon rules of evidence." *Haugen*, 274 Or App at 152 n 9.

[7] In *Haugen*, we ultimately concluded that the internet evidence was admissible as propensity evidence under OEC 404(4) based on our reading of *State v. Williams*, 357 Or 1, 24, 346 P3d 455 (2015), that OEC 404(4) "supersedes" OEC 404(3) in criminal cases. 274 Or App at 155-56. However, *State v. Baughman*, 361 Or 386, 403-04, 393 P3d 1132 (2017), later clarified that OEC 404(4) does not entirely supersede OEC 404(3), but rather supersedes only the first sentence in OEC 404(3). That is, *Baughman* clarified that in criminal cases OEC 404(4) "makes other acts evidence *admissible* to prove a defendant's character, subject to

the Rives evidence was irrelevant to the defendant's motive because, "even if we agree with the state's theory as to why evidence of the Vagos belief system was generally relevant to explain [the] defendant's motive," the Rives evidence "indicates only the strength of Rives's own commitment; it tells us nothing about [the] defendant's commitment." *Id.* at 158.[8]

Although in *Haugen* we concluded that the internet evidence was character evidence because it was offered "to convince the jury that [the] defendant's behavior on a specific occasion conformed to a set of beliefs or values that [the] defendant held," we observe that another intermediate inference in the logical chain of relevance also employed propensity reasoning: that a person's membership in a defined group may establish that the person acted in accordance with the group's beliefs or tenets, even absent evidence that the person has specifically or expressly adopted them. Both of those inferences relied on an inference about the defendant's character, that is, his "disposition or propensity to engage or not engage in certain types of behavior": his gang membership meant that he had a disposition to adopt his gang's beliefs and tenets, and holding those beliefs and tenets meant that he had a disposition to engage in violent behavior toward certain people in loyalty to his gang.

With that understanding of our holding in *Haugen*, we conclude that, under the circumstances of this case, the state's theory of relevance for the gang evidence that the trial court admitted to show defendant's hostile motive required the factfinder to employ impermissible propensity reasoning. The state offered evidence that (1) defendant is a longtime member of a particular group, the Woodlawn Park Bloods, (2) the group is criminal organization that is involved in a decades-long and ongoing violent rivalry with another criminal organization, the Crips, a rivalry that the state described as "modern gang warfare," and (3) the gang's

---

specified rules of evidence and the state and federal constitutions." *Id.* (Emphasis in original.) When the uncharged misconduct is not offered for a propensity purpose, "analysis under OEC 404(4) is unnecessary; the evidence 'may be admissible' under the second sentence of OEC 404(3)." *Id.* at 404.

[8] The Supreme Court later granted review and reversed our decision on a separate legal issue about eyewitness identification. *State v. Haugen*, 361 Or 284, 392 P3d 306 (2017).

criminal "culture" consists of certain "tendencies," "life-style," and the perpetration of violence out of loyalty to the gang. To infer from that evidence that "defendant's actions were motivated in part by the gang rivalry," requires two intermediate inferences: (1) because defendant is a member of the gang, defendant has personally adopted its criminal tendencies and lifestyle, including the violent rivalry with Crips members, and (2) because he has adopted his gang's tendencies and lifestyle, defendant has a propensity to commit violent acts generally and against Crips members in particular. The state wanted the factfinder to conclude that defendant acted in accordance with his adherence to his gang's rivalry with the victim's gang and to violent gang "culture" in committing the charged acts. Notably, the state's theory of relevance did not assume that defendant's "tendency to have such a motive is simply *human*" but rather assumed that defendant "is more inclined to act or think in a given way than is typical" *because he is a gang member. Davis*, 290 Or App at 252-53 (emphasis in *Davis*; internal quotation marks and citation omitted).

The state thus offered the gang evidence to persuade the factfinder that "it is more likely that [] defendant committed the charged crime" because defendant's gang membership means that he has both "a general propensity to engage in misconduct" and "a specific propensity to engage in misconduct like the charged crime." *Skillicorn*, 367 Or at 476. We therefore conclude that the state's theory of relevance employed impermissible propensity-based reasoning, because it required the factfinder "to rely on an inference about the defendant's bad character and resultant propensity to commit criminal acts." *Jackson*, 368 Or at 717.[9] The trial court erred in admitting the gang evidence.

In this case, defendant asserts, and we agree, that the admission of the evidence of defendant's gang membership, the history of the violent rivalry between defendant's

---

[9] Although we do not address the admissibility of the specific pieces of gang evidence challenged in defendant's second through eighth assignments of error, we note that the same analysis would apply: If the state's theory of relevance for a piece of uncharged misconduct evidence relies on an inference that defendant is a gang member and therefore acted in conformity with his disposition as a gang member, it employs impermissible propensity reasoning and is not admissible under OEC 404(3), regardless of the ultimate fact for which it is offered to prove.

gang and the victim's gang, and gang "culture" warrants reversal. We may affirm despite error only if there is "little likelihood that the particular error affected the verdict." *State v. Davis*, 336 Or 19, 32, 77 P3d 1111 (2003). When a defendant is convicted after a trial in which uncharged misconduct evidence was admitted, we look to the trial record to determine whether the error in admitting that evidence was prejudicial. *Morrow*, 299 Or App at 40.

The state emphasized defendant's motive arising from the "deep and bitter rivalry between long-term gangs in Portland" and "historical gang violence" in its arguments to the jury and used his gang membership as propensity evidence. In its opening statement, the state explained that Asheim would explain "what that rivalry is" and "what it means" and that "[w]hen you have Woodlawn Park Blood and Crips *** what happens between them? It certainly isn't just gentle street boxing" but rather "lots of shootings *** between these groups" that "result in homicides." In closing, the state invited the jury to "see the commitment that [defendant] has to the Woodlawn Blood gang" to infer his motive. And the state's final rebuttal argument urged the jury to "stand up and *** tell [defendant] his Blood vendetta, his gang rivalry that he tried to play out in that parking lot at our community hospital, that's a crime. It's unacceptable. It's unacceptable and a crime for him to continue this gang rivalry by trying to gun down [the victim]. *** Tell him all of this with four words: Guilty, guilty, guilty, guilty." Further, the state presented Asheim as a gang expert, emphasizing his unique training and experience that likely would have given his testimony greater weight with the jury than lay testimony. *See State v. Norby*, 218 Or App 609, 620, 180 P3d 752 (2008) (witness's status as a "neutral professional" likely gave her testimony "greater weigh in the jury's eyes").

Although defendant waived jury on Count 5, the state presented the same evidence to the court on that count and relied on its arguments to the jury to establish that defendant possessed a firearm. Further, the court's repeated limiting instruction did not cure the error, because "[t]o instruct that other acts may be considered only for purpose of motive *** does not avoid the problem if propensity

is the implicit link between" the other acts and the motive. *Tinoco-Camarena*, 311 Or App at 307 n 11. We cannot conclude that the gang evidence had little likelihood to affect the verdict, particularly given the circumstantial nature of the state's case. *See State v. Hargrove*, 327 Or App 437, 448, 536 P3d 612 (2023). For those reasons, we conclude that the error warrants reversal on all counts.

## II.   EVIDENCE FOUND IN CODEFENDANT'S HOUSE

Finally, because the issue is likely to arise on remand, we address defendant's tenth of assignment of error. Defendant argues that the trial court erred by admitting evidence of a gun, a holster, an empty gun box, ammunition, and a magazine that were found in codefendant's home three months after the shooting. Alternatively, defendant argues that if the evidence met the low relevancy threshold, the trial court should have excluded it under OEC 403.

Defendant argues that the evidence found in codefendant's home is not relevant, because it is not reasonable to infer from that evidence that *defendant* more likely engaged in the shooting. The state contends that the evidence was relevant to its theory that defendant shot at the victim with a .40 caliber handgun he retrieved from the trunk of codefendant's car in the hospital parking lot, because it is reasonable to infer that the empty gun box found in codefendant's home had once held the .40 caliber gun used in the shooting—a gun that was not recovered by the state. In defendant's view, the state's theory that defendant retrieved the gun from codefendant's trunk is not supported by the record, and the state's theory that the gun box must have belonged to a second Glock that defendant used in the shooting amounts to "sheer speculation."

"'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." OEC 401. Under that provision, "[e]vidence is relevant so long as the inference desired by the proponent is reasonable, even if the evidence also could support a contradictory inference." *State v. Titus*, 328 Or 475, 481, 982 P2d 1133 (1999). We conclude

that the evidence meets the "very low threshold" for relevancy. *State v. Gibson*, 299 Or App 582, 588, 451 P3d 259 (2019), *rev den*, 366 Or 691 (2020).

The state's theory is that: (1) defendant retrieved a .40 caliber Glock from codefendant's trunk on the day of the shooting; (2) the empty .40 caliber Glock gun box found in codefendant's house three months later did not match the .40 caliber Glock also found in codefendant's house; and therefore (3) the empty gun box at one time held the .40 caliber Glock defendant retrieved from codefendant's trunk on the day of the shooting. In support of its theory, the state represented that hospital surveillance videos showed defendant and codefendant in the hospital together and also showed defendant standing alone at codefendant's car trunk in the parking lot. The state also represented that an expert would testify that shell casings from a .40 caliber handgun were found at the scene, and that the gun box was manufactured for a .40-caliber Glock and did not match the .40 caliber Glock found in codefendant's house. While the third step in the logical chain does not necessarily follow from the first two steps—indeed, it may not even be the most probable inference—it possibly and plausibly follows. A reasonable factfinder could therefore infer from that evidence that it was more likely that defendant used codefendant's gun in the shooting.

Defendant next contends that, even if the gun box and related items are relevant, the trial court should have excluded the evidence under OEC 403, because the evidence had minimal probative value and was highly prejudicial given "the inherently speculative nature of the necessary inferences" to connect the evidence to the shooting.

We conclude that the trial court did not err. The court determined that the probative value of the evidence— its relevance to the state's theory that codefendant provided defendant with a gun—was not outweighed by unfair prejudice, because the evidence was found in codefendant's home, not defendant's, so the jury would not draw negative inferences about defendant possessing gun paraphernalia at home. Given our conclusion that the evidence is relevant without resort to speculation, we are not persuaded that the

trial court abused its discretion in admitting the evidence. *See Gibson*, 299 Or App at 589 ("In evaluating a trial court's discretionary ruling under OEC 403, our role is to assess whether the court's decision falls within the range of legally permissible choices.").

Reversed and remanded.